IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re: ) | |
| ) | |
| Larry Daniel Owens, ) | |
| ) | Case No. 13-20473 |
| Debtor. ) | |
| ) | Adv. No. 13-2036 |
| Noelle Hanks, Successor Trustee of the William ) | |
| L. Hanks Revocable Trust, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| Larry Daniel Owens, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM OPINION

Noelle Hanks, Successor Trustee of the William L. Hanks Revocable Trust (the "Plaintiff") filed a complaint seeking a determination that the debts owed to the Plaintiff by Larry Owens ("Owens" or "Debtor" or "Defendant") are not dischargeable pursuant to 11 U.S.C. § 523(a)(4). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1)[1].

The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons that follow, the Court

---

1 The Court notes that, although not raised, it has considered the issue of its power to enter a final order on the claim post *Stern*. It appears that a bankruptcy court can in fact liquidate the debt and enter a final judgment in conjunction with determining that the debt was excepted from discharge under §523(a) (which was not necessary here because Debtor waived discharge). A complaint to determine dischargeability is exclusively within the equitable jurisdiction of the bankruptcy court so it follows that the court may also render a money judgment in an amount certain. It is impossible to separate the determination of dischargeability function from the function of fixing the amount of the non-dischargeable debt and the Court has the power to enter a final order on the claim. *See In re Deitz*, 469 B.R. 11, 22 (B.A.P. 9th Cir. 2012). The Court further notes that because Debtor waived his right to discharge voluntarily, that issue became moot in this case and left the Court with only liquidation of Plaintiff's claim to determine. Neither party has objected to the Court entering a liquidation judgment on such claim.

sustains some of the claims asserted against the Debtor by the Plaintiff and denies others.

**FACTS**

On June 14, 2006, William L. Hanks ("Decedent"), executed the William L. Hanks Revocable Trust Agreement (the "Trust"). The Trust named debtor Owens and Phil Morris as co-trustees (the "Trustees"). William L. Hanks died in May 2008. Shortly thereafter, trustee Owens retained his spouse, Deborah Lynn Owens, d/b/a Dollars and Cents Accounting Service, as accountant for the Trust. The Trustees originally valued the assets of the Trust at approximately $1,500,000, which included cash at various banks in the amount of $14,849; stocks and bonds in the amount of $152,220; and real property interests in four farm properties in the amount of $1,332,800. Ex. 8. Subsequently, Owens and Morris, as co-trustees, liquidated a brokerage account and two of the farm properties for a net amount to the Trust of $1,105.692.48. Ex. 2, 2A & 2B.

On July 1, 2011, a lawsuit was filed in state court to remove Debtor and Morris as the Trustees. Subsequently, Owens and Morris resigned as Trustees and Plaintiff was appointed successor trustee. Trial was scheduled to commence on April 10, 2013 which proceeded against Morris. On April 12, 2013, the jury returned a verdict in favor of Plaintiff and against Morris in the amount of $450,000 compensatory damages and $400,000 punitive damages plus costs.

Owens filed a bankruptcy petition under Chapter 7 on April 9, 2013 before the trial commenced. On September 6, 2013, Plaintiff filed an adversary proceeding against Debtor seeking a determination of non-dischargeability of certain debts owed to it by Debtor under §523(a)(4). Specifically, Plaintiff alleges that Debtor defrauded the Trust of money or property in the principal amount of $937,302.11. *See* Plaintiff's Post-Trial Brief, p. 2. Plaintiff also alleged that Debtor obtained money or property from the Trust by false pretenses, false representations, or

actual fraud, other than a statement respecting the debtor's financial condition within the meaning of §523(a)(2)(A) and that such acts constituted willful and malicious injury by Debtor to the Trust under §523(a)(6). Plaintiff alleges that Debtor inappropriately used Trust funds to pay himself and Morris trustee fees in violation of the Trust, pay his wife as accountant fees in violation of trust fiduciary standards, make investments with Trust funds in entities in which Debtor held an interest and made loans to entities in which he had an interest and to other individuals in violation of the Trust language and trust statutes. Specifically, Plaintiff claims damages in the amounts of $100,908.02 for fees paid to Phil Morris as co-trustee, $163,720.09 for fees paid to Larry Owens as co-trustee, $67,544.34 for fees paid to Owens' wife Deborah Owens for accounting services to the Trust, $92,629.66 for payments paid to Morris for improvements and work done on farm property owned by Decedent, $137,500 in payments and/or investments made to Casa de Loco, an LLC owned by Owens; $360,000 in investments/loans made to Hannibal Sports and Entertainment Group LLC and CFD-3, baseball entities in which Owens had an ownership interest; $7,000 paid to Bob Flug; and $8,000 paid to Larry Buck. Plaintiff also claims statutory interest at 9% per annum since date of filing suit, July 1, 2011 to April 1, 2013 in the amount of $179,125.08 and attorneys' fees in the amount of $23,478.42. Ex. 53 and Plaintiff's Request for Award of Attorney's Fees and Costs (Doc. 41).

      Thereafter, the Court held a trial on the matter and the parties filed post-trial briefs. On July 8, 2014, Debtor filed a motion to waive discharge of his debts and the Court entered an order on July 31, 2014 granting Debtor's motion, thus mooting the issue of whether any debt owed by him to Plaintiff should be deemed non-dischargeable under §523(a)(4) or any other paragraph of §523(a). However, because the Court had already fully litigated the issue regarding dischargeability of the claim and damages it is proper for it to determine the amount of debt owed

3

to Plaintiff by Debtor. *See In re Neves*, 500 B.R. 651 (Bankr. S.D. Fla. 2013) (holding that Debtor's waiver of his discharge "no more divested this Court of jurisdiction to liquidate the claim than would have a determination by this Court that the debt was non-dischargeable before actually liquidating the claim—the two issues are intertwined, no matter in which order and however resolved, whether through consent or final adjudication.")

## Liquidation of Damages

The Court will discuss each allegation of damages to the Trust set forth on Plaintiff's Exhibit 53. The Court notes that Plaintiff conceded at trial and in its post-trial brief that the $200,000 line item for damages relating to "net debits from Citizens Bank & Trust account involving F&M Bank in Hannibal, Pulaski Bank, Bank of Versailles" was double-counted and already included in the $360,000 alleged loss from loans to the Hannibal Sports and Entertainment baseball entities.

## Fees Paid to Larry Owens

A trustee is entitled to reasonable remuneration for services rendered in managing a trust, *see generally*, Restatement Second, Trusts § 242, and, as a general rule, the fact that a trustee has profited by receiving a reasonable fee for administering a trust does not mean that the trustee has engaged in self-dealing. The Trust document itself provided that the Trustees were to be compensated according to the Country Club Bank and Trust fee schedule, Ex. 59. The fee schedule provided for an annual administrative fee of .9 of 1% on the first $1,000,000 and .5 of 1% on the next $4,000,000 plus, for irrevocable trusts, an additional fee of 0.10% on the market value of the trust. Plaintiff conceded in its brief that this would have calculated to an annual fee of $13,000 based on the Trust's opening inventory value. However, Owens, as co-trustee, was paid Trustee's fees in the amount of $163,720.09 for administering the Trust which had an

opening inventory value of $1.5 million.

Owens testified at trial that he compensated both himself and his co-trustee at the rate of $125.00 per hour based on advice from his attorney Jere Lloyd. Owens also claims that his attorney told him that the Trust fee schedule was not applicable because of the extraordinary services provided by the co-trustees based on the Bank fee schedule language that "the foregoing charges are for standard and customary services performed by Country Club Trust Company. Additional charges may be assessed if special or extraordinary services are required…." Ex. 59. Mo. Rev. Stat. §456.7-708 also provides that a court may allow a trustee more or less compensation than the trust specifies if the trustee's duties are substantially different than contemplated or the trustee's fees would be unreasonably high or low. Owens testified that because the trustee duties included travel from the Lake of the Ozarks to California and physical work in moving furniture from and fixing up a California condo his attorney approved a rate of $125 per hour because it was outside of the normal trust fee agreement. However, Debtor's attorney, Mr. Lloyd, did not appear at trial to testify or provide an affidavit and the Court can only infer from this that Mr. Lloyd would have testified adversely to his former client. None of these services for which Owens was compensated appear to the Court to have been in any way special or extraordinary nor substantially different that contemplated by the Trust, and the co-trustees should have been compensated based on the bank's fee schedule described above.

In addition, the evidence raises numerous questions about the propriety of some of the fees paid. Owens was paid for services such as attending the decedent's funeral for which he billed using the "portal to portal" rule including for time spent sleeping. He also testified that he was double-compensated for the funeral trip out of the probate estate in California. Further, Owens compensated himself for working on property that was not part of the Trust (the

5

condominium in California) and for which he got otherwise compensated by the California estate. There was evidence presented that approximately $38,000 or more in fees were paid to administer and collect non-trust property in California and Owens and Morris both received an additional $3900 from the California probate estate.

Here, Plaintiff established that some of the fees paid to Owens were not reasonable and, in certain instances, were not for Trust business or property. At trial, Plaintiff introduced Exhibit 53 which was a breakdown of the losses (damages) of the Trust. As noted, it identifies fees paid to Owens in the amount of $163,720.09. Defendant was entitled to some fees and Plaintiff does not appear to claim otherwise. Because Defendant failed to show that extraordinary or unanticipated services were required, no upward departure from the schedule referenced in the Trust was warranted. Although there is substantial evidence of double and overcharging the Trust for routine and contemplated tasks, and a lack of good-faith administration of the trust in the interests of the beneficiaries, the evidence does not show precisely what amount of the fees were so incurred and that the amount of the appropriate reduction would put the fees below the schedule amount. Plaintiff is, therefore, entitled to recover the amount of $124,720.09 ($163,720.09-$39,000 -total charges billed by Owens less 3 years of fee schedule rate for the time served as co-trustee from May 2008 until July 2011).

**Fees Paid to Phil Morris**

Plaintiff asserts that co-trustee Morris was paid fees in the amount of $100,908.02 that were unreasonable, excessive and in bad-faith for the same reasons discussed above as to Owens. Defendant Owens, as co-trustee, is responsible for these fees because he has a duty to exercise reasonable care to prevent a serious breach of trust by a co-trustee pursuant to Mo. Rev. Stat. §456.7-703.

6

As discussed above, and for the same reasons, the services provided to the Trust by Morris as co-trustee were not special or extraordinary and should have been compensated under the regular schedule of the bank. The Court agrees with Plaintiff that fees paid to Morris were unreasonable, excessive and in bad-faith, but only to the amount in excess of what should have been allowed under the bank's customary schedule for a total amount owed to the Trust by Owens of $61,908.02 ( $100,908.02- $39,000).

**Farm Improvement payments to Phil Morris**

Plaintiff alleges that payments made to Phil Morris in the amount of $92,629.66 were improper because the bulk of the property on which improvements were done was not Trust property and/or because the work was done as early as 2004, prior to decedent's death in 2008, but was not submitted for payment until after his death. Plaintiff also points out that the documents submitted invoicing the work done were created by Morris only after he was seeking payment from the Trust for the work. Owens testified that the decedent had instructed him to pay any debts that he owed from the Trust. Plaintiff claims that if it was a valid debt owed by the decedent that it should have been paid by the probate estate and approved by a probate judge in the appropriate proceeding. Plaintiff bears the burden to prove in what respects the trustee breached his duty, but once plaintiff has established a prima facie case by demonstrating the trustee's breach of fiduciary duty, the burden of explanation or justification shifts to the trustee. The trustee must show the use of due care, diligence and that he acted with the utmost good faith toward beneficiaries and made full disclosure of all facts related to the transactions at issue. *See* AmJur Trusts, § 627.

Plaintiff's argument that the alleged work performed by Morris was done on property not part of this Trust is unsubstantiated. Her argument that it should not have been paid because it occurred prior to the decedent's death is without merit. The Trust document provides that

following decedent's death, Trustee shall pay out of the trust principal all of decedent's legally enforceable debts, "including debts owed by me to a trustee individually, except debts which are an encumbrance on real property." Ex. 43, p. 2. If Morris was owed a debt by the decedent for work done prior to his death that he can show was actually performed, then Trustee was in compliance with the terms of the Trust in paying such debt.

The question becomes then whether the handwritten invoices submitted by Morris, Ex. 13, were sufficient for the Trustee to accept as proof of debt owed by the Trust and satisfy the Trustee's burden of explanation or justification.   The Court has reviewed the testimony and the invoices and believes that they do.   The invoices are detailed and specific.   Plaintiff's argument that the state court jury found the claim bogus is not persuasive because that jury verdict is not in evidence in this proceeding and the Court has no way to determine how or if it is relevant to Morris' claim.   Accordingly, the Court finds Plaintiff has not met her burden on this claim and that the payments to Morris in this instance were proper.

**Payments to Casa de Loco and Hannibal Sports and Entertainment Group LLC, et al, and Deborah Owens- Self-Dealing**

Plaintiff also asserts that Owens made $137,500 in loans from the Trust to an entity owned by Owens called Casa de Loco, LLC, a winery at the Lake of the Ozarks and $360,000 in loans to entities of which Owens was owner called Hannibal Sports and Entertainment Group LLC and CFD-3 (the "baseball entities") and $67,544.34 in payments to his wife for accounting services, which should be voided as prohibited self-dealing.

Section 456.8-802.3 provides that a sale, encumbrance, or other transaction involving the investment or management of trust property is presumed to be affected by a conflict between personal and fiduciary interests if it is entered into by the trustee with: (1) the trustee's spouse… or

8

(4) a corporation or other person or enterprise in which the trustee, or a person that owns a significant interest in the trustee, has an interest that might affect the trustee's best judgment. Subsection 2 provides that this conflict is voidable *unless* the transaction was authorized by the terms of the trust.

If Plaintiff establishes that Defendant engaged in self-dealing, and assuming Defendant fails to explain or excuse it, Plaintiff is entitled to appropriate relief. The purpose of the rule against self-dealing is to discourage trustees from placing themselves in a position of potential conflict of interest, not merely to subject trustees to liability for self-dealing. Consequently, even if a trustee can prove that in buying, selling, or managing trust property for personal benefit, scrupulous regard was given to the welfare of the trust beneficiary, the trust received fair consideration for its money or property, and the challenged transaction was fair in all respects, the mere fact that a trustee engaged in a self-interested transaction involving trust property will be considered a breach of trust, and will be sufficient to subject the trustee to liability. *See In re Estate of McCredy*, 470 A.2d 585 (Pa. 1983); *see generally* Restatement Second, Trusts §205.

Once self-dealing is established, the burden shifts to the defendant to justify the actions taken. To totally avoid the obligation to reimburse the trust, the defendant must prove both that the transaction that involved self-dealing was fair to the trust estate in all respects and that the defendant did not personally profit from the transaction. *See, e.g., Fulton National Bank v. Tate*, 363 F.2d 562 (5th Cir. 1966). Where loss to the trust estate is alleged, the defendant generally must prove that there was no loss, not merely that the loss was not proximately caused by self-dealing, since a trustee that engages in self-dealing is ordinarily liable for any loss, as long as the loss arises from the act of self-dealing. *See id.*

Mo. Rev. Stat. §456.8-802.1 provides that a trustee shall administer the trust

9

solely in the interests of the beneficiaries. *See also*, Restatement Second, Trusts §170. Trustees owe undivided loyalty to the trust and to the beneficiaries thereof; trustees are to act exclusively in the beneficiaries' interest and refrain from engaging in self-dealing. *Hillyard v. Leonard*, 391 S.W.2d 211 (Mo. 1965); *American Cancer Society v. Hammerstein*, 631 S.W.2d 858 (Mo. App. 1981). One of the duties owed a beneficiary by his trustee is the duty to use reasonable care and skill to make the trust property productive. *Tyler v. Citizens Home Bank of Greenfield*, 670 S.W.2d 954 (Mo. App. 1984); Restatement Second, Trusts § 181.

Even if a trustee neither buys property from nor sells property to the trust, there may be self-dealing, and a breach of the trustee's duty of loyalty, if the trustee uses or manages the trust property for personal profit or benefit. *Riegler v Riegler*, 553 SW2d 37 (Ark. 1977); *In re Estate of Pitzer*, 155 Cal. App. 3d 979 (1984); *Wright v Wright*, 514 P2d 73 (Col. 1973); *Wild West Motors Inc. v Lingle*, 728 P.2d 412 (Mont. 1986). *See generally*, Restatement Second, Trusts § 170 Comment 1. A trustee's duty of loyalty is violated where a trustee directly benefits from the use of trust property. For example, in *Riegler*, the defendant, a physician, was found to have breached the duty of loyalty by investing trust funds in unproductive real estate upon which he ultimately intended to locate his medical clinic.

### Casa de Loco

Plaintiff alleged, and Debtor conceded, that the Trust paid or loaned $137,500 to Casa de Loco, a winery owned by Debtor and his wife. Debtor claimed that the decedent had wanted and intended to invest in the winery during his lifetime and had begun the process two years prior to his death, Ex. 44, but that he never contributed the money. Ex. 50, p. 8. Owens testified that in exchange for the Trust investing in the winery it could take certain federal tax credits but he could not recall the amount of tax credits received. He testified that an entity can either sell tax credits,

10

or, if it makes money, it can use the tax credits to offset taxes owed.   Ex. 50, p. 8.

Owens testified that it would be necessary for the Trust to hold an equity interest in the winery in order to use the tax credits but there was no evidence presented by him that the Trust ever obtained an equity interest in the entity to benefit from the credits.   Owens was unable to explain how the Trust would benefit from federal tax credits other than an unknown, very tentative future use if there was tax owed by the Trust, which does not appear would be the case.   There was also no evidence that a promissory note was executed.   In fact, Debtor admitted in testimony that this was a bad loan and the winery cannot currently afford to repay the loan. Ex. 50, p. 9.

Based on the testimony and evidence presented, it is unclear whether the amount paid to Casa de Loco was a loan or for the purchase of the tax credits.   The distinction is irrelevant though because if it was a loan from the Trust to Case de Loco, it was imprudent.   There was not a promissory note executed and Owens testified that Casa de Loco cannot afford to repay the loan.   If the purpose of this transaction was for the purchase of tax credits by the Trust it was equally imprudent.   Debtor presented no evidence that the Trust could take advantage of such tax credits because it must have an equity interest in the company and it did not.   Also, to offset against taxes, the LLC must have a tax liability and no evidence was presented that it did or would.

### Hannibal Sports and Entertainment & CFD-3 (the "Baseball Entities")

Plaintiff also asserted that the Trust made payments to Clement Field Development 3 (CFD-3), of which Owens held a 1/3 ownership interest, and Hannibal Sports and Entertainment, of which Owens was also an owner, in a total amount of $360,000.   In exchange, the Trust received a promissory note to be repaid at 4% interest.   Owens also testified that he secured the loan from the Trust with his membership interest in the Baseball Entities stock (50% of stock in Hannibal Sports and Entertainment and 37% of stock in Hannibal Baseball Investment Group) but

there was never any evidence introduced to corroborate this and the promissory note is titled Unsecured Promissory Note.  Ex. 50, p. 13-17.  Owens also testified that the Baseball Entities showed a loss on the 2011 tax returns and it was also entered into evidence that a state court judgment against the Baseball Entities in the amount of $723,215.19, plus interest was entered in favor of F&M Bank.  Ex. 58.

### Analysis- Self Dealing regarding Casa de Loco and Baseball Entities

As discussed, §456.8-802.3 provides that a sale, encumbrance, or other transaction involving the investment or management of trust property is presumed to be affected by a conflict between personal and fiduciary interests if it is entered into by the trustee with: (4) a corporation or other person or enterprise in which the trustee, or a person that owns a significant interest in the trustee, has an interest that might affect the trustee's best judgment.   Section 456.8-802.2 provides that this conflict is voidable unless the transaction was authorized by the terms of the trust, or by other exceptions not applicable here.

Debtor argues that a provision in the Trust document specifies that there is no prohibition on self-dealing.  Ex. 43, p. 11. The provision cited by Debtor states that the Trustee may lend money to and purchase property from the personal representative of the estate, and retain for a period of time without liability for loss or depreciation of value.   It is questionable whether the Trust provision on page 11 cited by Debtor to authorize this self-dealing is applicable to this specific transaction as it specifically refers to the personal representative of the estate and the only evidence provided was that Debtor was the personal representative of an ancillary estate in California, not in Missouri.

He also pointed out a Trust provision on page 9 that provided the Trustee could invest in bonds, common or preferred stocks, notes, real estate mortgages, common trust funds, shares of

12

regulated investment companies, currencies, partnership interests (whether general, special, or limited), interests as members in limited liability companies, or other securities or property, real or personal, domestic or foreign, including partial interests such as life estate, term or remainder interests, ***without being limited by any statute or rule of law governing investments by trustees***. Ex. 43, p. 9. (emphasis added).   However, to the extent he is asserting this Trust term relieves him of liability for self-dealing, he is incorrect.   First, this general authorization to invest in certain kinds of entities is overridden by the more specific prohibition on self-interested investments. Second, §456.10-1008 provides that a trust term that relieves a trustee of liability is unenforceable to the extent that it relieves the trustee of liability for breach of trust committed in bad faith or with reckless indifference to the purposes of the trust or the interests of the beneficiaries.   There is more than sufficient evidence here to justify the application of this invalidation of either exculpatory clause.

Thus, under §456.8-802.3(4), there was a conflict of self-dealing by Owens as co-trustee investing and managing Trust property with Casa de Loco and the Baseball Entities, both enterprises in which he had an ownership and significant interest.   Based on the evidence presented, Plaintiff has established a prima facie case that these transactions were self-dealing by Owens and the burden shifts to him to justify or explain such transactions.   Taking into consideration the evidence and testimony presented and discussed above, the Court finds that Debtor has failed to do so.

Thus, Debtor's breach of the duty of loyalty by making loans to both the winery and the Baseball Entities in which Debtor was co-owner is blatant self-dealing.   This was established by Plaintiff and not justified by Debtor, and should be voided.   Debtor has provided no evidence that either of these loans in anyway benefitted the Trust or its beneficiaries and in fact, his testimony

lends itself to the conclusion that these loans in fact harmed the Trust and its beneficiaries. Owens' ownership interests in these entities and the large loans made to them at his direction from the Trust is a clear breach of the standard of administering the Trust in good faith in accordance with the terms and purposes of the Trust and for the interests of the beneficiaries. Mo. Rev. Stat. §456.8-801. Further, Debtor's argument that these loans might be repaid but no demand has been made by the Trust is irrelevant. The reason the Court is finding Debtor liable on the claims is not because they were not repaid but because the transactions violated his fiduciary duty of loyalty and self-dealing. Thus, Debtor is liable to Plaintiff in the full amount of the loans made to Casa de Loco ($137,500) and the Baseball Entities ($360,000).

**Fees to Debra Owens**

Plaintiff asserts that fees paid to Debra Owens in the amount of $67,544.34 for accounting services to the Trust were unreasonable, excessive and prohibited because Ms. Owens was the spouse of defendant Owens. Mo. Rev. Stat. §456.8-802.1 provides that a trustee shall administer the trust solely in the interests of the beneficiaries. Subsection 3 of that statute also provides that "[a] sale, encumbrance, or other transaction involving the investment or management of trust property is presumed to be affected by a conflict between personal and fiduciary interests if it is entered into by the trustee with: (1) the trustee's spouse." Such conflict between the trustee's fiduciary and personal interests is voidable by a beneficiary affected by the transaction unless, as discussed above, certain exceptions are met which is not the case here.

Based on all of the evidence and testimony presented, the Court finds that payment of Debra Owens' fees for accounting services for the Trust of which her husband was co-trustee should be voided. Plaintiff has established a prima facie case of self-dealing by showing that Owens, as co-trustee, immediately upon becoming Trustee hired his own wife to provide

14

accounting services to the Trust.   Thus, the burden shifts to Debtor to justify or explain such self-dealing and he has provided no evidence that does so and thus has failed to meet his burden.

The Court has reviewed the invoices submitted by Dollars and Cents Accounting and finds them to raise serious questions. Ex. 21.   Many of the hours billed include only generic descriptions of the service performed.   Many others are for routine administrative tasks.   For example, there are many time entries for going through mail.   Further, numerous of the hours claimed worked appear excessive.   For example, Ms. Owens billed for 8.5 hours for "phone calls with Mr. and Mrs. Morris, coordinating moving truck, look for original will" on May 14, 2008.   Whether these activities even relate to accounting services is doubtful and that they took Ms. Owens 8.5 hours is excessive.   All of the later invoices list only generic descriptions of activity and do not include dates or specific descriptions of work performed.   Activity descriptions of "opening mail, sorting etc.," "vendor correspondence," "accounts payable," "Land Rover activity," "account reconciliation, filing, misc.," are too vague and generic for the Court to conclude what was actually done in service to the Trust and whether it was necessary or beneficial.   Such vague invoices combined with the self-dealing of Owens employing his wife's accounting business leads this Court to the conclusion that these charges should be voided as a violation of Owens' fiduciary duty.   The Court finds that Owens is liable as Trustee to reimburse Plaintiff the amounts paid, $67,544.34.

**<u>Loan to Bob Flug</u>**

Plaintiff alleges that Trustee is also liable for a payment made to Bob Flug in the amount of $7,000.   Owens testified that Flug is a contractor and this was payment for work done by Flug on a house owned by decedent and was therefore paid as a debt owed by decedent.   However, a document characterized by Debtor as a promissory note was introduced into evidence that purports

to show that Flug would repay the money to the Trust.

As discussed above, Plaintiff bears the burden to prove in what respects Trustee breached his duty, but once Plaintiff has established a prima facie case by demonstrating Trustee's breach of fiduciary duty, the burden of explanation or justification shifts to Trustee. Here, Plaintiff established a prima facie case that Trustee breached its fiduciary duty by demonstrating the inconsistency in the explanations for the payment. The Trustee then has the burden of explanation or justification that the $7,000 paid to Flug was for a valid trust purpose. Trustee did not meet that burden. The Court cannot find that the $7,000 paid to Flug was a benefit to the Trust because it is not able to even determine whether the payment was in the form of a loan or a payment on a debt. The fact Owens testified that it was for payment owed by decedent for work done on a property owned by him, but then also submitted a purported promissory note showing that Flug would repay the money is at odds with any explanation that such payment was for a Trust purpose or benefited the Trust. Thus, Owens is liable in the amount of the $7,000 payment.

**Payments to Larry Buck**

Plaintiff also asserts that an $8,000 payment to Larry Buck by Trustee was an abuse of fiduciary duty because it was not a payment that benefited the Trust or for a Trust purpose. Owens testified that Buck was decedent's friend and had assisted him in finding a place in California and that Buck told the co-trustees that decedent promised to pay him for assisting him. On this payment, Trustee does present an explanation or justification of valid payment and provides documentary confirmation on Exhibits 8 & 9. Those exhibits show that from the beginning Buck was listed as having a claim against the decedent. On the Charge and Discharge Statement dated for the period May 9, 2008 to December 31, 2008, this was listed on Schedule B as a debt of decedent in the amount of $2,000. Ex. 8. On the Charge and Discharge Statement

dated for the period January 1, 2009 to December 31, 2009, it was listed as a debt of decedent in the amount of $8,000.  Ex. 9.  Although Debtor is unable to provide an actual invoice from Buck and testified that this was a verbal claim, the fact that it was consistently treated from the beginning of the Trust administration as a debt of decedent meets Debtor's burden of justifying the payment as one for a Trust purpose, i.e., payment of decedent's legally owed debts.

### Summary

The evidence indicates that Trustee entered into these transactions in bad faith or with reckless indifference to whether they were prudent or furthered the purposes of the trust and were in the interests of the beneficiaries.  In addition to what has already been noted, there was evidence submitted that Owens acquired Camden County property in his own name using Trust proceeds, a transaction he did not even attempt to justify or explain. As Trustee, he failed to provide timely accountings to the beneficiaries even after multiple requests. Mo. Rev. Stat. §456.1-105.9 provides that a Trustee has a duty to respond to requests for information. He double-billed for work done on the California property to both the Trust and the California probate estate and he billed the Trust for 24 hour days when he travelled to California.  Defendant arranged that the Trust pay his and the co-trustee's fees in an amount in excess of the compensation specified by the Trust, the accountant fees incurred by his wife and the beneficiaries that included a friend's daughter and Owens' son.  However, the Trust failed to pay the bulk residual beneficiary, the University of Oregon.  All Trustee needed to do to fulfill his duties as Trustee was to liquidate any Trust property and arrange for all beneficiaries to be paid.  Instead, Owens as co-trustee entered into convoluted loans/investments with Trust money and continued to bill the Trust $125 per hour for every task performed for over three years.  The Court can draw inferences from the Trustee's conduct with respect to the Trust while acting as co-trustee and

17

conclude that many actions were entered into with inappropriate intent and bad faith and certainly not in the spirit of fiduciary duty. Many were imprudent and infected with conflict of interest. As discussed, any Trust term that purported to give Trustee authority to invest and loan Trust property is superseded by his duty to act in good faith and in accordance with the purposes of the Trust, i.e., to pay the decedent's debts and the intended beneficiaries. Mo. Rev. Stat. §456.1-105.2.

Based on all of these reasons and the previous discussions, the Court finds that Debtor is liable to the Trust in the amount of $61,908.02 for trustee fees paid to Phil Morris and in the amount of $124,720.09 for trustee fees paid to Larry Owens in excess of the schedule set forth in the Trust document. Debtor is also liable in the amount of $67,544.34 for fees paid to his wife Debra Owens, $137,500 for payments made to Casa de Loco and $360,000 for payments/loans made to the Baseball eEntities due to self-dealing and breach of his fiduciary duty. He is also liable for $7,000 for payment made to Bob Flug in violation of the Trust for a total liability of $758,672.45. Plaintiff is also entitled to requested statutory interest under Mo. Rev. Stat. § 408.020 at 9% per annum in the amount of $68,280.52.

Regarding the requested attorney fees, Plaintiff filed a Request for Award of Attorneys' Fees and Costs with itemized fee statements attached. The Court has reviewed Plaintiff's request and fee statements and determined that she is entitled to such fees and costs pursuant to Mo. Rev. Stat. §456.10-1004 in the requested amount of $23,478.42. Based on the itemization provided, the fees and costs are reasonable under the circumstances and are approved.

For the above reasons, it is hereby

**ORDERED** that Defendant owes Plaintiff the sum of $850,431.39 for damages for breaches of his fiduciary duty as a co-trustee of the William L. Hanks Revocable Trust, including

statutory interest and attorneys' fees.


Dated:     March 9, 2015                          /s/ Dennis R. Dow


                                        THE HONORABLE DENNIS R. DOW
                                        UNITED STATES BANKRUPTCY JUDGE


Copies to:

Fredrich J. Cruse

Scott W. Ross

Brian M. Holland